FILED

09/20/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0512

DA 15-0512

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 234N

IN THE MATTER OF:

B.R. and J.R.,

      Youths in Need of Care

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighth Judicial District,<br>In and For the County of Cascade, Cause Nos. ADN-12-150 and<br>ADN-12-151<br>Honorable Gregory G. Pinski, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

            Scott Albers, Attorney at Law, Great Falls, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana

            John Parker, Cascade County Attorney, Valerie M. Winfield, Deputy County Attorney, Great Falls, Montana

            Allen P. Lanning, Lanning, Harris & Conklin, P.C., Great Falls, Montana (*Attorney for Youths*)

                      Submitted on Briefs: June 22, 2016

                              Decided: September 20, 2016

Filed:

                                        _____
                                               Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Ju.R. (Father) appeals the order of the Eighth Judicial District Court, Cascade County, terminating his parental rights to J.R. and B.R. (Children). The Children are enrolled members of the Chippewa Cree Tribe (Tribe), thus making them Indian children under the Indian Child Welfare Act (ICWA). We address whether the District Court's Order is supported by evidence beyond a reasonable doubt that Father's custody of the Children would likely result in serious emotional or physical damage to the Children.[1] We affirm.

¶3 This case began in 2009, when the Department of Public Health and Human Services (Department) became involved with S.R. (Mother) and the Children. On December 23, 2009, Father stipulated to the Children being adjudicated youths in need of care and signed a treatment plan. On December 27, 2010, the District Court noted that "Father continues to state he does not want to do nor does he think he should have to do a treatment plan." On December 8, 2011, the Department petitioned to terminate Father's

---

[1] In Father's Reply Brief to this Court, he alleges that the District Court "terminate[d] his parental relationship with his children simply as a matter of retribution for a perceived insult to the Court's authority." Father fails to express what the "perceived insult" is, and fails to cite to the record or any legal authority in support of this allegation. We therefore decline to address it.

2

parental rights for failure to complete his treatment plan and abandonment. On March 1, 2012, the Department petitioned to terminate Mother's parental rights for failure to complete her treatment plan. On March 8, 2012, the District Court granted Father's motion to continue the termination hearing. On May 11, 2012, the District Court transferred jurisdiction of the matter to the Tribe, pursuant to ICWA. The Tribe returned the Children to Mother.

¶4 On October 1, 2012, the Department petitioned for emergency protective services, adjudication as youths in need of care, and temporary legal custody of the Children because Mother violated the Order of Protection she had against Father by taking the Children to Father's residence, where Mother was arrested for assaulting Father. On February 20, 2013, the District Court held a Show Cause and Adjudicatory Hearing on the Department's petition. The resulting order adjudicated the Children youths in need of care because it found, among other facts, that: (1) Father "violated the order of protection [on several occasions] because 'they're my family'"; (2) the Department effectuated emergency removal of the Children from Father's residence after police were involved with a domestic disturbance between Father and Mother; (3) Father "ha[d] been very hostile and intimidating with [the Department] . . . threaten[ing] to 'track [or hunt] down the kids' at their foster home and stated he had previously been to the foster home"; and (4) Father failed to sign a form to allow the foster parents to provide out-of-town treatment for J.R.'s abscessed tooth.

¶5 In March of 2013, Father moved to dismiss the case and objected to the treatment plan, alleging the Department lacked evidence and even allegations of Father abusing or

3

neglecting the Children. On April 2, 2013, the District Court overruled Father's motions and objections, stating in part that the record contains sufficient evidence showing Father's "very clear anger, violence and paranoia." In a June 28, 2013 Order, the District Court noted "the parents are making visits but that they are not cooperating on doing any other part of their treatment plans."

¶6 On September 18, 2013, the Department petitioned to terminate Father's and Mother's parental rights for failure to complete the treatment plans. On January 3, 2014, the Department withdrew the petition, in order to give the parents an additional three months to work on the treatment plans, even though Father had yet to complete any portion of his treatment plan, except for occasionally visiting the Children. On April 25, 2014, the District Court granted the Department's motion to extend temporary legal custody of the Children.

¶7 On June 6, 2014, the Department filed another petition to terminate Mother's and Father's parental rights. The Department attached an affidavit from the case's Child Protective Specialist (CPS) to the petition. The CPS attested that family-based services had to stop for Father and Mother because they constantly missed visitations and, when visitations did occur, the environment was hostile, which also led to death threats from Father to the CPS. One CPS testified: "And [Father] said, I will [expletive omitted] hunt you down. I'll [expletive omitted] kill you." Two other CPSs were able to corroborate this testimony because Father was on speaker-phone. Father's anger issues and failure to make his treatment plan a success, among other issues, led the District Court to terminate his parental rights.

4

¶8 On July 28, 2014, the District Court held a termination hearing. On September 30, 2014, the District Court issued an order terminating Father's and Mother's parental rights. On October 28, 2014, Father's counsel moved for a new trial for Father because Father allegedly was not afforded additional time required by ICWA to prepare for the termination hearing. The District Court granted a new trial, to be held on December 12, 2014.

¶9 On December 11, 2014, the District Court spoke with the Children in camera. The District Court held the termination hearing the next day and informed the parties that the Children stated they did not want to go home to their parents because they were scared to do so. The District Court then suspended the hearing to address a potential contradiction in testimony, in light of testimony from a collateral criminal matter involving Father. After resolving that issue, the District Court scheduled the termination hearing to continue.

¶10 On May 28, 2015, before the termination hearing resumed, another district court sentenced Father to the Department of Corrections for ten years, with five years suspended. On June 25, 2015, the termination hearing resumed. On July 13, 2015, the District Court entered its findings of fact, conclusions of law, and order, in which it concluded beyond a reasonable doubt that terminating Father's parental rights, and keeping the Children in their current placement, best serves the Children's interests. Father appeals.

¶11 We review a district court's decision to terminate parental rights for abuse of discretion. *In re K.B.*, 2013 MT 133, ¶ 18, 370 Mont. 254, 301 P.3d 836. In ICWA

5

cases, we will uphold the district court's termination of parental rights if a reasonable fact-finder could conclude beyond a reasonable doubt that allowing the parent to continue with custody would likely "result in serious emotional or physical damage to the child." *K.B.*, ¶ 18. A district court abuses its discretion when it acts "arbitrarily, without employment of conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *In re M.J.*, 2013 MT 60, ¶ 17, 369 Mont. 247, 296 P.3d 1197 (citation omitted). We review a district court's factual findings for clear error. *In re A.K.*, 2015 MT 116, ¶ 20, 379 Mont. 41, 347 P.3d 711. We review a district court's conclusions of law for correctness. *K.B.*, ¶ 18.

¶12 Title 25, Section 1912(f) of the U.S. Code provides:

> No termination of parental rights may be ordered in [a] proceeding [involving an Indian child] in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

The District Court terminated Father's parental rights, finding "by proof beyond a reasonable doubt that continued custody of the [Children] by the parents is likely to result in serious emotional or physical damage to the children." Notwithstanding the considerable evidence to support the District Court's finding—as summarized above—Father contends the District Court erred because of alleged conflicting testimony given at the termination hearing. Father relies on the testimony of a Department employee, a forensic evaluator, a licensed clinical professional counselor, and a mental health professional. We consider the testimony of each of these witnesses in turn.

6

¶13 The Department employee Father relies on was involved in this matter from May 6, 2013, to March 12, 2014. On January 22, 2014, she helped Father obtain an extension to complete his treatment plan because "[t]he children wanted to stay with their parents. They expressed that constantly." The employee also testified to a number of other issues that were all unresolved at the time she stopped working on the case. Although the Department employee stated the Children wanted to stay with Father, those interactions with the Children contradict the District Court's subsequent in camera interview with the Children, indicating the Children's fear of Father made them not want to stay with Father. A mental health professional testified that the Children were "scared to go to [Father's] house, to the parents' house when [the Department was] not there." Further, on January 16, 2014, the Guardian ad Litem reported to the District Court that the Children "have been out of their parental care and home for 47 months since 2009," and the Children's time with their foster parents "is the only period of time that the children have done well . . . ."

¶14 The forensic evaluator Father relies on completed a parenting evaluation of Father on February 1, 2014. The evaluation concluded that Father should "complete the State's treatment plan that had been presented to him" and attend co-parenting counseling. At the hearing, the evaluator learned about Father's pending criminal charges, which he was "very concerned about." The evaluator further stated that he would also be concerned if Father "had not completed his treatment plan as recommended." Father did not complete his treatment plan or apply its lessons to his home environment.

¶15 While acknowledging that Father still loved Mother and the Children, the licensed clinical professional counselor upon whom Father relies testified that "[Father] was not open to individual therapy . . . [and] did not do the homework."

¶16 The mental health professional upon whom Father relies testified, as noted above, that J.R. "did not seem very happy about visits at the parents' home . . . [and] stated . . . he was scared to go to his house, to the parents' house when [the Department was] not there." Father's cross-examination of this witness attempted to attribute all of the family's parenting problems on Mother. However, when asked whether she would "approve of [Father] keeping his parental rights" as long as Mother is out of the picture, the mental health professional offered a qualified answer that such might be possible "under certain circumstances." This qualified possibility was considered by the District Court along with the years of opportunities Father had to comply with his treatment plan, restraining orders he ignored, and parenting instruction he failed to implement.

¶17 The Department provided ample testimony from other witnesses to support the District Court's determination that Father's custody of the Children is likely to result in serious emotional or physical damage to the Children. The District Court correctly applied ICWA's § 1912(f) criteria to its findings of fact, and the District Court correctly applied all the necessary Montana and ICWA criteria to hold, on multiple grounds, that Father's parental rights had to be terminated.

¶18 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear

8

application of applicable standards of review. The District Court did not abuse its discretion in terminating Father's rights. Substantial evidence beyond a reasonable doubt supported the District Court's determination that Father's custody of the Children is likely to result in serious emotional or physical damage to the Children. The District Court therefore did not abuse its discretion when terminating Father's parental rights. We affirm.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE